FRED E. BRIESACHER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Briesacher v. Commissioner
Docket No. 6583-75.
United States Tax Court
T.C. Memo 1979-43; 1979 Tax Ct. Memo LEXIS 483; 38 T.C.M. (CCH) 162; T.C.M. (RIA) 79043; January 30, 1979, Filed Fred E. Briesacher, pro se. Patrick J. Dowling, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1971 in the amount of $ 3,210.22. The issue for decision is the amount, if any, of petitioner's understatement of his 1971 adjusted gross income which respondent determined to be $ 25,731.70 by the source and application of funds method of reconstructing income. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Fred E. Briesacher, resided in Waynesville, Missouri at the time of the filing of his petition in this case. Petitioner and his wife, Edna L. Briesacher, [1] filed a timely joint Federal income tax return for the calendar *484 year 1971 with the Internal Revenue Service Center in Kansas City, Missouri. During 1971, Mr. Briesacher operated three businesses in Waynesville, Missouri: (1) General TV, a retail appliance store; (2) KFBD FM-AM, a radio station; and (3) the Circle Lounge, a tavern which he acquired on August 4, 1971. In 1973 petitioner sold the KFBD radio station business to two employees, Mr. James DeAngio and his wife. At the time of the sale the records for the year 1971 and some subsequent periods of KFBD and General TV were left in an office which petitioner had used as a private office. Thereafter the DeAngios took these records to their home. On September 30, 1974, the DeAngios ceased to operate the radio station and about that time petitioner filed an action to place them in involuntary bankruptcy. On October 16, 1974, a *485 special agent of the Intelligence Division of the Internal Revenue Service obtained petitioner's records from the DeAngios and on December 10, 1974, returned petitioner's records to the DeAngios. The receipt given by respondent's agent to the DeAngios for the records received from them listed the records in general categories such as "4 pkg. check stubs," "7 bundles of control cards," and "24 folders containing miscellaneous papers." Certain items were identified as KFBD and certain items as General TV. Also listed were sales registers and check registers of KFBD and General TV for various periods other than the year 1971. Respondent's agent made copies of many, but not all, of petitioner's records while they were in his possession. After the records were returned to the DeAngios there was a fire in the area where petitioner's records were stored. Thereafter in 1975, pursuant to a Court order, some of petitioner's records were obtained by him from the DeAngios. In 1971, petitioner maintained six checking accounts at the Waynesville Security Bank under the following names: (1) KFBD FM-AM Radio; (2) KFBD Payroll; (3) General TV and Appliance Center; (4) General TV and Appliance *486 Center Payroll; (5) Circle Lounge; and (6) Fred or Edna Briesacher. Petitioner, during the year in issue, was indebted on notes to the following entities in the amounts as follow, the purposes of certain of the loans also being shown: AMOUNT OF NOTE HOLDER
NOTE
PURPOSE
(a) Gates Radio Company
$ 12,694.08  Purchase, on March 27,
Quincy, Illinois
1968, of radio station
equipment
(b) Waynesville Security Bank
9,100.00  Purchase of Piper
Waynesville, Missouri
Commanche 260 airplane
(Loan #6312)
on November 18, 1969
(c) Waynesville Security Bank
3,180.00  Waynesville, Missouri
(Loan #6341)
(d) Waynesville Security Bank
43,680.00  Waynesville, Missouri
(Loan #6440)
(e) Universal CIT Credit
6,219.00  Purchase, on October 17,
Corporation
1969, of 1970 Lincoln
Springfield, Missouri
automobile
(f) Collins Radio Company
2,002.20  Purchase, on August 15,
Dallas, Texas
1970, of radio station
equipment
(g) The Bank of Crocker
3,000.00  Purchase, in January
Crocker, Missouri
1969, of 1967 Lincoln
(Note #187.54)
automobile
(h) The State Bank of Dixon
5,000.00  Dixon, Missouri
(Loan #34,016)
(i) Continental Electronics
9,566.46  Purchase, in 1966, of
System, Inc.
radio station equipment
Dallas, Texas
(j) Delta Loan & Finance
9,193.50  Purchase, in July 1971,
Company
of 1968 Cessna 172 airplane
Waynesville, Missouri
(Account #18080)
*487 During 1971, periodic principal and interest payments were made on the notes described above as follows: (aa) Twelve payments, each in the amount of $ 264.46, were made to the Wynesville Security Bank as collection agent for Gates Radio Company on the note described in (a) above, for a total amount paid, during 1971, of $ 3,173.52. All of these payments were made with checks drawn on petitioner's KFBD FM-AM Radio checking account (KFBD checking account); (bb) Twelve payments, each in the amount of $ 151.66, were made to the Waynesville Security Bank on the note described in (b) above, for a total amount paid, during 1971, of $ 1,819.92. Eleven of these payments were made with checks drawn on petitioner's KFBD checking account and one of these payments was made with a check drawn on petitioner's General TV and Appliance Center checking account; (cc) One payment, in the amount of $ 265, was made to the Waynesville Security Bank on the note described in (c) above. This payment was made with a check drawn on petitioner's General TV and Appliance Center checking account; (dd) Twelve payments, each in the amount of $ 364, were made to the Waynesville Security Bank on the note *488 described in (d) above, for a total amount paid, during 1971, of $ 4,368. Eleven of these payments were made with checks drawn on petitioner's KFBD checking account and one of these payments was made with a check drawn on petitioner's General TV and Appliance Center checking account; (ee) Two payments, each in the amount of $ 172.77, were made to Universal CIT on the note described in (e) above, for a total amount paid, during 1971, of $ 345.54. Both of these payments were made with checks drawn on petitioner's KFBD checking account; (ff) Eight payments, seven in the amount of $ 167 each and one in the amount of $ 165.20, were made to Collins Radio on the note described in (f) above, for a total amount paid, during 1971, of $ 1,334.20. All of these payments were made with checks drawn on petitioner's KFBD checking account; (gg) Three payments, in the respective amounts of $ 200, $ 934 and $ 564, were made to The Bank of Crocker on the note described in (g) above, for a total amount paid, during 1971, of $ 1,698. These payments were made with checks drawn on petitioner's KFBD checking account; (hh) Two payments, in the respective amounts of $ 456 and $ 744, were made to *489 The State Bank of Dixon on the note described in (h) above, for a total amount paid, during 1971, of $ 1,200. These payments were made with checks drawn on petitioner's KFBD checking account; (ii) Seven payments, six in the amount of $ 191.32 each and one in the amount of $ 190.95, were made to Continental Electronics on the note described in (i) above, for a total amount paid, during 1971, of $ 1,338.87. These payments were made with checks drawn on petitioner's KFBD checking account; and (jj) Three payments, two in the amount of $ 170.25 each and one in the amount of $ 340.50, were made to Delta Loan and Finance Company on the note described in (j) above, for a total amount paid, during 1971, of $ 681. These payments were made with checks drawn on petitioner's KFBD checking account. The interest portions of the above 1971 payments were as follows: (aaa) Gates Radio Company: $ 269.10. (bbb) Waynesville Security Bank (Loan #6312): $ 585.25. This note provided for computation of unearned interest upon prepayment under section 408.170 Revised Statutes of Missouri. In 1971 petitioner made the 13th through the 24th monthly payments. (ccc) Waynesville Security Bank (Loan *490 #6341): $ 15. The 1971 payment was the last of 12 monthly payments of $ 265. In all, $ 3,000 in principal and $ 180 in interest were paid over the 12-month period. (ddd) Waynesville Security Bank (Loan #6440): $ 2,453.35. The amount is computed for the 7th through the 18th monthly payments under the provisions of the note which provided that each payment was first to be credited to interest then due and the remainder in reduction of principal. (eee) Universal CIT Credit Corporation: $ 59.94. This note provided for 36 equal installments of $ 172.77 beginning with November 1969. However, petitioner traded in his 1970 Lincoln for a 1971 Lincoln after two 1971 payments on this note. In all, $ 5,000 in principal, $ 140.96 in life insurance and $ 1,078.92 in interest were owed under the note. (fff) Collins Radio Company: $ 81.44. The amount is computed for the 5th through the 12th monthly payments under the provisions of a Purchase Money Security Agreement which provides for payment of $ 2,002.20, including a $ 122.20 finance charge, and for a prepayment allowance as required by law. (ggg) Bank of Crocker (Loan #187.54): $ 98. Two payments of interest by petitioner in *491 1971 were credited by the bank, one for $ 64 and the other for $ 34. (hhh) The State Bank of Dixon (Loan #34,016): $ 300. (iii) Continental Electronics System, Inc.: $ 32.48. (jjj) Delta Loan & Finance Company: $ 133.38. The 1971 payments were the first of 50 payments. Petitioner acquired the Circle Lounge tavern on August 4, 1971, through lease of the building housing that tavern. The lessor of those premises was Thomas J. Fraley. At acquisition, the Circle Lounge owed the City of St. Robert, Missouri $ 1,231.49. As a condition for approving a liquor license for petitioner, the city required petitioner to pay the $ 1,231.49 it was owed. On August 26, 1971, petitioner paid on behalf of the Circle Lounge $ 1,231.49 in liquidation of the amount owed to the city. The check to the city was drawn on petitioner's Circle Lounge checking account. The Circle Lounge lease required petitioner to pay to the lessor $ 2,000 as advance payment for the first 3 months' rent and the last month's rent. [2] The $ 2,000 was paid in August of 1971 by three checks: (1) $ 500 from petitioner's checking account; (2) $ 500 from the Circle Lounge account; and (3) $ 1,000 from the Circle Lounge *492 account. During 1971, Horace Corley was an employee of KFBD FM-AM Radio. On August 12, 1971, KFBD paid Mr. Corley $ 150 with a check drawn on petitioner's KFBD checking account. During 1971, petitioner and his wife *493 drew checks on their personal account totaling $ 5,162.28 that were in payment of petitioner's living expenses. Checks were drawn on petitioner's KFBD checking account during 1971 as follows: PAYEE
DATE
CHECK
AMOUNT
Don Flowers Assoc., Inc.
1-06-71
3973 $ 100.00
Don Flowers Assoc., Inc.
1-08-71
3975
52.50
Crossland Flying Service
1-13-71
3979
18.64
Oakwood Service Station
1-13-71
3985
18.98
Walmart #21
1-13-71
3992
74.02
Prudential Ins.
1-23-71
3998
100.90
Crossland Flying Service
1-25-71
4006
840.00
Don Flowers Assoc., Inc.
2-04-71
4020
52.50
Don Flowers Assoc., Inc.
2-05-71
4025
100.00
Oakwood Service Station
2-10-71
4027
52.13
Pulaski Scottish Rite
2-12-71
4031
3.00
Crossland Flying Service
2-16-71
4049
7.30
Waynesville Optical
2-19-71
4053
16.42
Uregas of Waynesville
2-22-71
4054
98.88
City of St. Robert
3-02-71
4063
84.00
City of St. Robert
3-02-71
4064
127.25
Don Flowers Assoc., Inc.
3-08-71
4072
52.50
Dept. of Revenue
3-09-71
4075
107.80
Oakwood Service Station
3-10-71
4080
78.32
Combined Ins. of America
3-15-71
4092
5.00
Flying
3-15-71
4093
10.50
American Red Cross
3-19-71
4094
10.00
Miller Ins.
3-22-71
4098
1,118.00
Combined Ins.
3-23-71
4099
180.00
Don Flower Assoc., Inc.
4-09-71
4122
52.50
Oakwood Service Station
4-14-71
4133
139.84
Miller Ins.
4-20-71
4147
572.00
Trade-a-Plane
4-21-71
4149
2.00
Don Flowers Assoc., Inc.
5-06-71
4168
52.50
Playboy Club
5-14-71
4187
6.00
Aircraft Components
5-21-71
4192
152.06
Oakwood Service Station
5-21-71
4199
156.94
Office of Wm. H. Jones
6-07-71
4226
5.20
Don Flowers Assoc., Inc.
6-07-71
4225
52.50
Oakwood Service Station
6-12-71
4240
99.33
County Treasurer
6-12-71
4251
13.38
Uregas of Waynesville
6-17-71
4256
30.13
University of Missouri
6-24-71
4263
300.00
Pacific Mutual Life Ins.
6-28-71
4266
125.00
Miller Ins.
6-29-71
4268
829.00
Dept. of Revenue
6-30-71
4270
25.90
Combined Ins. Co.
7-02-71
4277
34.00
Don Flowers Assoc., Inc.
7-05-71
4280
52.50
Oakwood Service Station
7-07-71
4293
150.99
Parrish Floral
7-07-71
4294
10.30
Uregas of Waynesville
7-31-71
4312
80.34
Snowbird Lodge
8-03-71
4313 $ 687.00
Oakwood Service Station
8-10-71
4331
73.32
Parrish Floral
8-10-71
4334
42.30
Walmart #21
8-10-71
4340
121.04
Oakwood Service Station
9-13-71
4376
39.34
Combined Ins. Co.
9-17-71
4387
180.00
Abou Ben Adhem Temple
9-20-71
4388
36.00
Miller Ins.
9-24-71
4393
614.00
Miller Ins.
9-28-71
4395
7.00
Oakwood Service Station
10-11-71
4416
52.35
Skyway Aviation
10-11-71
4421
278.36
Dickman Aviation
10-12-71
4426
741.94
Clark Natl. Ball Park
10-18-71
4430
55.00
Dept. of Revenue
10-21-71
4435
237.30
Combined Ins.
10-28-71
4436
5.00
Natl. Life & Accident
10-28-71
4437
197.87
Dept. of Revenue
11-01-71
4441
32.40
Oakwood Service Station
11-10-71
4460
139.10
Miller Ins. Co.
11-15-71
4469
535.00
U.S.O.
11-17-71
4471
440.00
Don Flowers Assoc., Inc.
11-17-71
4472
183.00
Ancient Scottish Rite
11-29-71
4483
15.00
Dept. of Revenue
12-01-71
4486
30.02
Don Flowers Assoc., Inc.
12-07-71
4492
53.42
Oakwood Service Station
12-13-71
4516
118.08
Parrish Florist
12-13-71
4517
54.10
Fields Gas & Heating
12-13-71
4525
356.38
Combined Ins.
12-20-71
4540
34.00
Uregas of Waynesville
12-23-71
4542
137.25
Uregas
12-30-71
4550
55.62
*494 Some of these checks were written to pay petitioner's personal expenses; some to pay KFBD-business expenses; and some to pay a combination of personal expenses and KFBD-business expenses. During 1971, petitioner paid LacLede Electric Company $ 1,508.75 with checks written on his General TV and Appliance Center checking account. Of this total, $ 154.41 was paid for electricity used in petitioner's personal residence. In his residence, petitioner maintained a desk, a telephone and files which he used for business purposes. On July 14, 1971, a Notice of Federal Tax Lien was filed by the Internal Revenue Service in the office of the Pulaski County Recorder of Deeds in Waynesville, Missouri, against Marie L. Smith of Waynesville for income tax deficiencies arising from her taxable years 1968 and 1969. On August 11, 1971, petitioner purchased two house trailers from Mrs. Smith for $ 7,782' Title was transferred on that date. Petitioner obtained the $ 7,782 purchase price from Delta Loan & Finance Company of Waynesville. The loan called for monthly payments of $ 129.70 from petitioner. On September 14, 1971, petitioner made a payment of $ 129.70 on this loan with a check drawn *495 on his Circle Lounge account. On August 23, 1971, the Internal Revenue Service seized the two house trailers pursuant to its July 14, 1971, Federal tax lien; and on October 12, 1971, sold them, applying the proceeds to Mrs. Smith's 1968 and 1969 income tax deficiencies. During 1971, merchandise totaling $ 420.29 was sold to Mrs. Briesacher by the Lilli Ann Dress Shop of Waynesville. Petitioner paid for this merchandise with a "trade-out" from his KFBD business. The "trade-out" consisted of radio advertising services for the Lilli Ann Dress Shop in exchange for the merchandise. During 1971, petitioner's KFBD business maintained a sales register in which were recorded amounts received for radio advertising services. During that year, 79 different amounts, totaling $ 2,861.89, which were not deposited to petitioner's KFBD business checking account, were recorded in the 1971 KFBD sales register as income. Petitioner himself made collection on accounts from KFBD customers. Petitioner at times instructed his KFBD bookkeeper, Mrs. Joanne DeAngio, to credit a customer's account for an amount paid, although he did not hand over to her the money paid by the customer. During 1971, *496 petitioner's KFBD business received checks totaling $ 99.14 from V & R Advertising, Michigan Bulbs Company, Gates Radio Company and Reich Poultry Farm, Inc. in payment for radio advertising services. These checks were not deposited to petitioner's KFBD checking account, but were cashed at the Waynesville Security Bank. In 1969, petitioner purchased some equipment and parts for his radio station from Gates Radio Company for $ 6,272.10 and the 3 percent sales tax on the purchase was $ 188.16. Upon receipt of the equipment petitioner paid $ 1,615 of its cost in cash. The balance, $ 4,845.26, was due in 48 monthly installments of $ 123.15 to begin 60 days after shipment. The interest or finance charges over the life of the loan were to be $ 1,065.94. The first payment was not made until 1971, but the seller did not charge petitioner interest for the delay in payment. The seller's records show four 1971 payments on petitioner's account: (1) June 10, 1971 - $ 123.15; (2) June 17, 1971 - $ 2,363.36; (3) June 30, 1971 - $ 2,358.75; and (4) June 30, 1971 - $ 1,065.94. The seller's books show interest earned on the first two payments as $ 43.68 and $ 42.77, respectively. And on June 30, 1941, an *497 adjustment for unearned interest is shown as $ 979.49. As of June 30, 1971, the loan balance is shown as zero. During 1971, KFBD made the following three payments with checks drawn on petitioner's KFBD checking account: Check
Check Payee
Date
Amount
Gates Radio Company
6-15-71
$ 2,363.36
Waynesville Security Bank
6-04-71
123.15
WRHL Radio
3-23-71
1,000.00
$ 3,486.51
The above-described checks were in payment for studio appliance equipment acquired by petitioner for use in his KFBD radio station business. The payment of $ 123.15 included an interest payment of $ 43.68 and the $ 2,363.36 payment included interest of $ 42.77. The purchases from Gates Radio Company included relays which have a useful life of less than a year. The sales tax payment included in the amount paid to Gates Radio Company was $ 69.78. On March 8, 1971, petitioner purchased a 1971 Lincoln Mark III automobile for $ 9,380.40. The purchase price for the 1971 Lincoln was paid by petitioner with a $ 1,694.66 note payable to the seller, Mark Twain Motors; the proceeds of a $ 5,000 loan from Ford Motor Credit Company; and a trade-in allowance of $ 5,880.40 on a 1970 *498 Lincoln owned by petitioner, reduced by $ 3,194.66 owed on an outstanding loan secured by the 1970 Lincoln, for a net trade-in allowance of $ 2,685.74. Petitioner's income tax returns for 1969 and 1970 claimed depreciation expense deductions on the 1970 Lincoln in the respective amounts of $ 1,614 and $ 1,021. In 1971, petitioner's home was within 100 yards of his KFBD business premises. Petitioner's every day duties at the radio station were those of selling advertising to and collecting advertising bills from, customers. In performing these duties, petitioner used his automobile (after March 8, 1971, his 1971 Lincoln) regularly for driving to and from meetings. On May 20, 1971, petitioner paid $ 1,694.66 to Mark Twain Motors, pursuant to the note payable which petitioner had signed when he purchased the 1971 Lincoln, by a check drawn on his KFBD checking account. During 1971, petitioner made payments on the $ 5,000 loan from Ford Motor Credit Company, incurred to purchase the 1971 Lincoln, in the total amount of $ 1,566.99. Of this total, $ 1,268.45 was in reduction of the principal. On October 21, 1971, petitioner purchased a 1970 Winnebago motor home from Davis *499 Auto Sales of Waynesville for $ 9,800. The Winnebago was purchased with a $ 2,800 cash downpayment and the proceeds of a $ 7,000 loan which petitioner obtained from The Bank of Crocker, Crocker, Missouri. This Winnebago was purchased for KFBD for use in off-premises broadcasting. It was used for this purpose and by petitioner personally for pleasure trips. Petitioner's $ 7,000 loan from The Bank of Crocker, Note #22724, consisted of a $ 7,000 principal amount plus $ 140.20 for credit life insurance, for a total balance, as of October 22, 1971, of $ 7,140.20. On November 22, 1971, KFBD made a payment on this note in the amount of $ 231.04, which consisted of $ 183.40 in payment of principal and $ 47.64 of interest. On December 22, 1971, KFBD made a payment on this note in the amount of $ 231.04, which consisted of $ 184.62 in payment of principal and $ 46.42 of interest. The respective balances of petitioner's checking accounts on December 31, 1970, and on December 31, 1971, were as follows: 12-31-70
12-31-71
KFBD FM-AM Radio $ (103.11)
$ 1,202.72
KFBD Payroll
469.99
962.27
General TV and Appliance
Center
6,520.70
561.51
General TV and Appliance
Center Payroll
290.98
257.96
Circle Lounge
0
(268.64)
Fred or Edna Briesacher
344.79
312.87
*500 The net decrease for the six accounts in 1971 was $ 4,494.66. During 1971, petitioner owned a 1967 Cessna 150 aircraft which he had purchased in 1970. On November 2, 1971, petitioner sold the aircraft, receiving $ 3,500 from the sale in 1971. In petitioner's General TV and Appliance Center business a sales register was maintained in which were recorded sales, the receivable portion of sales, and amounts received on account for each month of 1971. The receivable portion of each sale was recorded in the "cash receivable" column of petitioner's sales register, and the total for each month of 1971 is shown on Line 36 of the respective month's page in the sales register. The receivables generated by petitioner's General TV and Appliance Center business for each of the months of 1971 are as follows: Month
Cash Receivable
January
$ 4,788.80
February
2,499.75
March
1,370.69
April
1,654.17
May
675.00
June
693.92
July
1,234.45
August
777.75
September
1,701.70
October
220.95
November
499.46
December
28.70
Total
$ 16,145.34
Petitioner's sales register further records, for each month of 1971, the amounts received on account by petitioner's *501 General TV and Appliance Center business, in column 3 of each month's page: Month
Received on Account
January
$ 4,580.07
February
3,963.83
March
784.06
April
1,225.46
May
611.78
June
1,964.34
July
1,330.67
August
1,631.98
September
700.03
October
566.64
November
0
December
0
Total
$ 17,358.86
During 1971, petitioner owned three aircraft but did not own more than two at any given time during the year. These aircraft were partly used for business purposes. In 1971, petitioner utilized five vehicles in his business: (1) A 1964 Ford Econoline; (2) a 1965 Ford Econo-Van; (3) a 1970 Lincoln; (4) a 1971 Mark III Lincoln (which replaced the 1970 Lincoln in March of 1971 on a trade-in purchase); and (5) a 1970 Winnebago motor home acquired on October 21, 1971. Two other cars owned by petitioner were used exclusively as personal cars primarily by his wife and daughter, a 1965 Mercury Sedan and a 1965 Ford Galaxy. The inventory for petitioner's Circle Lounge business increased by $ 900 in 1971. The inventory for petitioner's General TV and Appliance Center business decreased $ 13,837.35. Petitioner and his wife on their Federal income *502 tax return for 1971 reported a net loss of $ 6,761.45. Attached to this return were three Schedule C's, one for the profit or loss of General TV, one for the profit or loss of KFBD Radio, and one for the profit or loss of Circle Lounge. On the Schedule C for General TV, gross receipts of $ 60,030.75 were reported. Cost of goods sold was reported as $ 68,297.46, resulting in a gross loss before subtraction of business deductions of $ 8,266.71. The cost of goods sold was computed by showing an inventory at the beginning of the year of $ 55,651.05, merchandise purchased of $ 34,199.33 and cost of labor of $ 20,260.78, making a total of $ 110,111.16. From this total was deducted the inventory at the end of the year of $ 41,813.70. Other deductions, which consisted of depreciation, insurance and other business expenses, totaled $ 11,092.99, with a resultant net loss of $ 19,359.70. The Schedule C for KFBD Radio reported a net profit of $ 13,730.37. On this Schedule C, gross receipts were shown as $ 117,055.29, cost of labor as $ 41,365.65 and gross profit as $ 75,689.64. Other deductions, which included depreciation, rent on business property of $ 12,000, insurance, legal and *503 professional fees, interest on business indebtedness and other business expenses, totaled $ 61,959.27. Therefore petitioner arrived at the net profit above-stated of $ 13,730.37.
The Schedule C for the Circle Lounge showed gross receipts of $ 12,826.40, merchandise purchased of $ 8,431.31, cost of labor of $ 4,850.11, and inventory at end of the year of $ 900. On this basis petitioner arrived at cost of goods sold of $ 12,381.42, with a resultant gross profit of $ 444.98. Other business deductions included $ 1,200 of rent on business property and $ 377.10 of other business expenses for a total of $ 1,577.10, resulting in a net loss of $ 1,132.12 for the year. The return reported no income items other than the business income items. Three exemptions were claimed on the return. Respondent in his notice of deficiency recomputed petitioner's income on the basis of a source and application of funds method, explaining that this was done "in the absence of adequate records." On the basis of a source and application of funds method, respondent arrived at an increase in petitioner's taxable income for 1971 of $ 25,731.70. In computing petitioner's tax respondent reduced the additional *504 income arrived at by the loss of $ 6,761.45 reported on the return and allowed petitioner itemized deductions totaling $ 3,484.36. The itemized deductions consisted of contributions of $ 619, interest expense of $ 1,963.46, taxes of $ 570.41 and medical expenses of $ 331.49. Petitioner was also allowed three exemptions of $ 675 each, totaling $ 2,025. OPINION In his petition, which was filed pro se, petitioner alleged generally that he disagreed with respondent's disallowance of "certain deductions by your taxpayers" and the increase in petitioner's income without documentation or justifiable cause. At the trial and on brief, petitioner contends that respondent was not justified in computing his income by the source and application of funds method. Petitioner contends that he did have adequate records at the time his tax return was prepared and that these records did support his return as filed. He argues that his returns had been investigated for a number of years prior to 1971 and, after his records were examined, no substantial changes had ever been proposed. This contention was confirmed to some extent by a witness of respondent's who was the revenue agent who audited *505 petitioner's returns for a 3-year period, either from 1967 through 1969 or 1968 through 1970. Respondent offered the testimony of this agent to substantiate certain depreciation determined for 1971. The agent testified that petitioner had agreed in 1969 to certain adjustments with respect to depreciation on a tower and antenna and certain equipment used in his radio station business. This witness, in answer to questions by petitioner, testified that he found no substantial errors in the returns as filed by petitioner for the years he examined and that the depreciation adjustments he made were minor.In fact, he testified that in two of the three years his audit resulted in refunds being due to petitioner in the amounts of $ 391 and $ 434. Certain copies of petitioner's records were placed in evidence in this case and, although not kept as a professional accountant might keep records, they appeared to be basically accurate. Much of the information used by respondent came from these records. Mrs. DeAngio, who was called as a witness by respondent, had been petitioner's bookkeeper during the years here in issue. Her prejudice towards petitioner was so apparent that we place little *506 reliance on any testimony she gave unfavorable to petitioner. However, she admitted that the books which she kept for the radio station and General TV were accurate. She testified that petitioner would come in some mornings and tell her that the evening before he had collected a certain amount of cash from persons who were indebted to the radio station for advertising and that he would have her enter this on the books and credit the customers' accounts, even though petitioner kept the cash rather than depositing it in the radio station bank account. Respondent makes much of the fact that not all funds collected by petitioner from advertising sold to customers of the radio station were deposited in the radio station bank account. Petitioner argues that some of the funds not deposited consisted of cash he turned over to Mrs. DeAngio, in effect accusing Mrs. DeAngio or her husband of stealing cash from him. Also, petitioner pointed out that all amounts collected from the radio station customers were included in receipts on the books of the radio station from which the tax returns were made and therefore were not omissions of income from his tax return. Petitioner states that since *507 he was the owner of the business any funds paid to the business and recorded on the books of the business as receipts which he kept for his own use rather than depositing merely saved a deposit and withdrawal. Mrs. DeAngio in effect testified that all receipts from sales by General TV were recorded on the sales register either under cash received or cash receivable. The sales journal shows, for the year 1971, cash received of $ 31,385.09 and cash receivable of $ 16,145.34, the total of these two items being $ 47,530.43. Added to this amount was $ 500.32 of "Trade-in" to arrive at total sales of $ 48,030.75. It is obvious that the sales and cost of goods sold of General TV were intended to be reported on an accrual method of accounting. Apparently, when a TV or other appliance was purchased from General TV, the amount of cash paid was entered under cash received and the amount to be paid later was entered as cash receivable. Also included in this journal was a column "Received on Account" which for the year totaled $ 17,358.86 and an item marked "Trade-in" which totaled for the year $ 500.32. Petitioner, in explanation of certain items, offered a schedule which explained the *508 $ 60,030.75 of gross receipts reported on the Schedule C for General TV as consisting of the $ 48,030.75 of sales and $ 12,000 of rental income. The record is not clear as to the source of the rental income, but from testimony in the record with respect to the building owned by petitioner it is possible that the rent paid of $ 12,000 shown on the Schedule C of the radio station is the rental income of General TV. Also, accepting the figures furnished us by petitioner of gross sales of $ 48,030.75 and cost of goods sold of $ 68,297.46 including the labor cost of $ 20,260.78, we would have to conclude that the merchandise was sold by petitioner at an actual loss, as compared to its cost, of $ 5.93. While this of course is possible and might be shown if petitioner were now able to produce all of his business records, in our view it is most doubtful that petitioner did not obtain in appliance sales more than the amount he paid for the appliances sold. When this fact is considered in connection with the fact that none of petitioner's purchase records for General TV were produced at the trial, the now absence of many of petitioner's other records and the unprofessional manner in which *509 petitioner's books were kept, there is an indication that were all of petitioner's records available they would not substantiate the loss claimed by petitioner for General TV. We have not been unmindful of the fact that petitioner's radio business showed a substantial profit and the Circle Lounge only a small loss so that, in substance, the loss reported on petitioner's 1971 return is the result of the relatively substantial loss from the appliance business. Petitioner in his oral testimony made no explanation of why he would sell appliances for less than their direct cost and the inference is that petitioner's cost of sales is very likely inaccurate. Again, had petitioner's case been well presented petitioner might have shown an adequate explanation for this unlikely occurrence. However, we must take the record here as we find it. We have gone into some detail with respect to the records of petitioner, copies of which are in evidence, to show that while these records were not well kept they probably were, if all of them were available, sufficient to allow a reasonably accurate computation of petitioner's income for the year 1971. The problem in determining whether respondent *510 was justified in using a source and application of funds method is to what extent petitioner's records were available at the time of the examination of petitioner's tax returns. Clearly, the records which were available at the time of the trial in this case were not adequate for a reasonably accurate computation of petitioner's income, although they did demonstrate a number of errors in respondent's source and application of funds method. Petitioner's position is that he was not responsible for the lack of availability of his records at the time of the trial. He, in effect, accused the DeAngios of deliberately moving his records, which had been in an office at the radio station or at least in the building with the radio station or a close-by building, to their home in order to selectively furnish them to an agent for respondent.The DeAngios said that petitioner's records were in an office of the radio station at the time they bought it and they merely removed the records to make extra space. Because of the animosity that existed between petitioner and the DeAngios, it is difficult to ferret out the complete circumstances surrounding the removal of the records of the radio station *511 and General TV to the DeAngios' home. Additionally, from the record it is not clear if the papers which were removed also included records of the Cirole Lounge. The very fact that a special agent of respondent's rather than a revenue agent signed the receipt for the records taken from the DeAngios, and this receipt was signed approximately two weeks after petitioner forced the DeAngios into involuntary bankruptcy, suggests to us that the DeAngios deliberately removed the records and in some way indicated to the Revenue Service that the income reported by petitioner might be fraudulently reported. However, there is nothing in the record to directly support this speculation. The explanation offered by the DeAngios for the lack of part of the records at the time in 1975 that petitioner obtained them in connection with a court proceeding he had brought against the DeAngios, apparently in connection with the failure of the DeAngios to pay him for the radio station, is that some of the records were destroyed by fire. According to the DeAngios, petitioner forced them into involuntary bankruptcy and "took everything we had." The DeAngios stated that the items taken by petitioner were *512 all in accordance with a court order. Petitioner of course argues that any records destroyed by fire were deliberately burned by the DeAngios. Not only does the record show a receipt by a special agent to the DeAngios for certain of petitioner's records, but it also shows that a special agent obtained various statements from banks with respect to loans to petitioner and repayments by petitioner of those loans. However, the determination of deficiency asserted no addition to tax for fraud, and in fact did not even assert an addition to tax for negligence. The record as a whole, however, discloses that petitioner is not totally blameless for the lack of availability of his records. Certainly petitioner should have carefully preserved his records at some place over which he had complete control after he sold the radio station to the DeAngios. Apparently petitioner and the DeAngios were close friends at the time petitioner sold the radio station to the DeAngios. Mrs. DeAngio had been an employee of petitioner for over 5 years at the time of the sale and Mr. DeAngio had been employed by the radio station at times.It may be that petitioner, for this reason, considered it unnecessary *513 to remove his records when he sold the station. Respondent argues that having sold the radio station to the DeAngios it would have been incumbent upon petitioner to leave the radio station records. If in fact there was any such agreement, which the record does not show, petitioner should have either kept or left copies so as to retain control of his records. Furthermore, even respondent's argument does not explain leaving with the DeAngios the General TV records and possibly, though it is not clear, some records of the Circle Lounge. The record is not clear whether petitioner himself was approached at the beginning of the investigation of his 1971 return with respect to production of his records. There is no explanation in the record of why a special agent went to the DeAngios to obtain petitioner's records. Much of the difficulty here lies in the fact that petitioner appeared pro se and did not produce evidence in explanation of many points that are unclear in this record. Although petitioner might have had available, had an attorney properly prepared his case, evidence to show a lack of justification of respondent's use of the source and application of funds method in computing *514 his taxable income for 1971, on the basis of the record here as a whole and considering all the evidence we conclude that respondent was justified in using the source and application of funds method for the computation of petitioner's income for the year 1971. Our conclusion that respondent was justified in using the source and application of funds method in no way intimates that we approve his computation. In fact, on brief respondent conceded certain errors in that computation and we have found many errors in addition to those conceded by respondent. The following schedule shows the application of funds and source of funds as determined by respondent in his notice of deficiency, as conceded by respondent in his brief, and as we determine it on the basis of this record: APPLICATION OF FUNDS
December 31, 1971
As Determined in
Respondent's
As Conceded by
Notice of Deficiency
Respondent on Brief
As We Find
Decrease in Notes Payable: Gates Radio Company (radio equipment)
$ 3,173.52
Waynesville Security Bank (Loan #6312)
1,819.92
Waynesville Security Bank (Loan #6341)
265.00
Waynesville Security Bank (Loan #6440)
4,368.00
Universal CIT (1970 Lincoln)
345.54
Collins Radio (radio equipment)
1,334.20
Bank of Crocker (Note #187.54)
1,134.00
State Bank of Dixon (Loan #34,016)
1,200.00
Continental Electronics (radio equipment)
1,338.87
Delta Loan
681.00
$ 15,660.05
$ 15,396.65
$ 14,190.51
Increase in Loans Receivable: Payment on Behalf of Thomas Fraley
1,231.49
$ 1,231.49
Loan to Horace Corley
150.00
1,381.49
150.00
1,381.49
1,381.49
Prepaid Rent - Circle Lounge
1,000.00
1,000.00
500.00
Personal Living Expenses: Payments from personal checking account
5,162.28
5,162.28
$ 5,162.28
Payments from KFBD checking account
9,074.94
6,765.00
5,228.73
Payments from General TV checking account
142.21
142.21
142.21
Payments from Circle Lounge checking account
129.70
129.70
100.00
Trade-Outs from Lilli Ann Dress Shop
525.60
420.29
420.29
KFBD Income Not Deposited
3,049.89
2,861.89
2,861.89
KFBD Income Checks Cashed at Bank
99.14
18,183.76
99.14
15,580.51
99.14
14,014.54
Studio Equipment Acquired
3,486.51
3,486.51
3,236.35
Purchase of 1971 Lincoln Automobile
9,380.00
9,380.00
9,380.00
Purchase of 1970 Winnebago Motor Home
9,800.00
9,800.00
9,800.00
TOTAL
$ 58,891.81
$ 56,025.16
$ 52,502.89
*515 SOURCE OF FUNDS
December 31, 1971
As Determined in
Respondent's
As Conceded by
Notice of Deficiency
Respondent on Brief
As We Find
Net Decrease in Bank Accounts: KFBD FM-AM Radio - Increase $ 779.22 $ 1,305.83
KFBD Payroll - Decrease/Increase
( 86.32)
492.28
General TV & Appliance Center - Decrease
( 4,321.35)
( 5,959.19)
General TV & Appliance Center Payroll -
Increase/Decrease
166.90
( 33.02)
Circle Longe - Decrease
( 268.64)
( 268.64)
Fred or Edna Briesacher - Decrease
( 27.89)
$ 3,758.08
( 31.92)
$ 4,494.66
$ 4,494.66
Net Decrease in Inventory: Circle Lounge, Per Return - Increase
900.00
900.00
General TV & Appliance Center, Per
Return - Decrease
(13,837.35)
12,937.35
(13,837.35)
12,937.35
12,937.35
Decrease in Accounts Receivable: (General TV)
1,213.52
1,213.52
1,213.52
Increase in Taxes - Payroll and Sales: Circle Lounge - Payroll
511.36
511.36
Circle Lounge - Sales
377.10
888.46
377.10
888.46
888.46
Depreciation Expense
KFBD: Tower and Antenna
242.20
242.20 $ 242.20
Transmitter Equipment
680.50
680.00
680.00
Studio Equipment
100.00
100.00
100.00
Transmitter
1,606.10
1,606.10
1,606.10
Automation Equipment
991.20
991.20
991.20
1971 Lincoln Automobile
450.00
930.00
General TV: Building
716.11
716.11
716.11
Building Remodeling
1,100.00
1,100.00
1,100.00
Truck
490.00
277.00
490.00
Winnebago Motor Home
5,926.11
6,162.61
85.00
6,940.61
Basis of 1970 Lincoln: Cost
6,723.00
Less Depreciation Claimed
( 2,635.00)
4,088.00
Trade-In Allowance - 1970 Lincoln
5,880.40
Less Payoff of Universal CIT Note
( 3,194,66)
2,685.74
2,685.74
Increase in Notes Payable: 1971 Bank of Crocker Loan for Winnebago
7,000.00
7,000.00
Less Nov. & Dec. 1971 Principal Payments
( 368.02)
6,631.98
( 368.02)
6,631.98
6,631.98
1971 Ford Mtr. Cr. Loan for 1971 Lincoln
5,000.00
5,000.00
Less April-Dec. Principal Payments
( 1,268.45)
3,731.55
( 1,268.45)
3,731.55
3,731.55
Mark Twain Motors Note
1,694.66
Less May 20, 1971 Payment
( 1,694.66)
0
0
Adjusted Gross Income Per Return
(6,761.45)
(6,761.45)
(6,761.45)
Nontaxable Portion of Capital Gain
746.51
Cashier's Check from Sale of Home in Prior Year
2,000.00
Nontaxable Proceeds from Airplane Sale
3,500.00
3,500.00
TOTAL
$ 33,160.11
$ 35,484.42
$ 38,262.42
Understatement of Adjusted Gross Income
$ 25,731.70
$ 20,540.74
$ 14,240.47
*516 Our determination of the addition to petitioner's adjusted gross income as reported, set forth in the schedule above, in conjunction with the facts we have found, is in large part self-explanatory. Petitioner made no contention that any expenditures which he made in 1971 came from funds which he had available prior to that year not in bank accounts, except with respect to a part of the downpayment on the Winnebago. We are not, therefore, confronted, as we are in some cases involving source and application of funds, with any major argument that a source of funds other than as set forth in the computation was available to petitioner for expenses during the year. Petitioner's major contentions are that the amount of the decrease in notes payable is overstated in respondent's computation because of respondent's failure to properly adjust in all instances for interest, that his personal living expenses are overstated, that his depreciation deductions are understated and that the downpayment on the Winnebago came from a source not allowed in respondent's computation. In all of these areas we have made certain adjustments. Petitioner did not contend that respondent's allowances for *517 interest with respect to the loans from Gates Radio Company, Bank of Crocker, State Bank of Dixon, and Continental Electronics Systems, Inc. were in error. We have made no changes in these amounts. Petitioner contended that the interest adjustment made by respondent for Loan No. 6312 from the Waynesville Security Bank was substantially understated. Interest on this loan, as we have set forth in our findings, was to be computed under Sec. 408.170, Revised Statutes of Missouri. [3] We agree with petitioner.Respondent's calculation of interest was on the basis of equal monthly amounts of interest paid rather than interest payments on the unpaid balance, which appears to be the manner in which the interest was charged under the terms of the note. See Gunderson Bros. Engineering Corp. v. Commissioner, 42 T.C. 419 (1964). We have computed interest on the basis of the provisions in the note. [4]
*518 The record is not clear whether petitioner questions the interest as determined by respondent in computing decreases in notes payable on the Waynesville Security Bank Loan No. 6341. However, it appears from the record that the amount allowed by respondent in this instance is accurate. The same situation is applicable to the loans from Universal CIT Credit Corporation, Collins Radio Company and Delta Loan & Finance Company. From our view of the record, we conclude that the Waynesville Security Bank Loan No. 6440 provided for the computation of interest calculated against a declining balance with payments to be applied first to interest. Our calculation of interest paid on this loan is made on this basis. The only argument petitioner makes with respect to increases in loans receivable is that the amounts were not loans but gifts. It is difficult to determine from the record the nature of these items. Effectively, they were advances. In any event, they did constitute funds expended by petitioner in the year 1971 and therefore are proper applications of funds.
Under the stipulation of the parties, the $ 2,000 advance payment of rent was for the first three months and the last *519 month of the lease. The first three months after the August purchase date were September, October and November 1971. Therefore, only $ 500 was an advance payment for a year other than 1971. We have therefore determined the prepayment of rent for the Circle Lounge to be $ 500 rather than $ 1,000 as contended by respondent. In connection with personal living expenses, the major disagreements between the parties center on the personal items of petitioner's paid from the KFBD checking account, the item of $ 129.70 paid from the Circle Lounge checking account, the cash not deposited in the KFBD bank account and the checks to KFBD totaling $ 99.14 which were cashed rather than deposited. Petitioner's bookkeeper, Mrs. Joanne DeAngio, and Mr. DeAngio testified with respect to the nature of these payments. A number of these items paid by KFBD checks were clearly personal items of petitioner's and had been so noted on the books at the time the checks were drawn. Other items involved allocations such as payments for gas used in petitioner's residence and in the businesses with one check. One item, a payment for water and sewerage, had initially been considered by Mrs. DeAngio as a business *520 expense, but was allocated by respondent. On the basis of this record we conclude that this item was totally a business expense. The largest single item of personal expenses paid by KFBD checks in controversy is the cost of insurance, upkeep and other costs in connection with petitioner's airplanes. Respondent considers all these expenses as personal expenses. Even the DeAngios somewhat begrudgingly admitted that petitioner made some business use of these airplanes.Petitioner argues that the planes were used half for business and half for personal use. Although the record is far from complete with respect to the airplanes, we have concluded they were partially used for business and, using our best judgment based on the record as a whole, have determined that the business use was one-third of the total use. Therefore, we have considered only two-thirds of these airplane expenses to be personal expenses of petitioner's. We have considered all the evidence in the record and on this basis have found the amounts set forth in our findings. We conclude that total payments of personal items of petitioner's from the KFBD checking account were $ 5,228.73. The $ 129.70 payment from *521 the Circle Lounge checking account was a payment on a note for money petitioner borrowed to purchase two trailers. At the time petitioner purchased these trailers the Government had a tax lien against the trailers for taxes owed by the person who sold the trailers to petitioner. After petitioner purchased the trailers the Government foreclosed its lien. Petitioner's testimony was that the lawyer for the loan company investigated the title to the trailers and did not find the tax lien against them and that he had no knowledge of such a lien. Petitioner's argument does not go only to the $ 129.70 payment but to the entire amount paid for the trailers which he contends constituted a loss to him in 1971. Although the record shows that the Government did foreclose on the trailers in 1971, petitioner has not shown that he lacked any recourse for recovering the sums he paid for the trailers at the close of the year 1971. In any event, since petitioner's income was reported on the cash basis, the maximum loss he would have actually sustained in 1971 would have been the cash payment of the $ 129.70 made in the year 1971. On the basis of this record we have concluded that petitioner did *522 not have a loss of that amount by the end of 1971.However, the $ 129.70 was a payment on a note, a part of which was interest. Therefore, we have considered only $ 100 of the amount to constitute an application of funds for 1971.If the $ 129.70 was considered an application of funds, the interest portion would be either a business or a personal deduction. Under the method used here by respondent, the interest would be added in one part of the computation and excluded in another. Therefore the adjustment would not affect the overall results. Petitioner's primary argument with respect to the KFBD income not deposited and the KFBD checks cashed is that not all of this money was kept by him but that some of it was, in his words, "stolen" from him by the DeAngios. From the evidence, we gather than petitioner does not deny that he did keep out some amounts of cash for personal use after the receipts of the funds were entered on the books of the business. Our conclusion from the evidence as a whole is that petitioner did retain the amounts of cash as set forth in respondent's computation in the year here in issue. Petitioner made no argument that this cash was deposited in his personal *523 bank account or used for business expenses but apparently considered that any cash not deposited and kept by him was used for personal expenses. Therefore, on the basis of the record as a whole we have determined that the amounts of $ 2,861.89 and $ 99.14 were cash used by petitioner in 1971 for his personal expenses. The purchases of studio equipment are shown by the record. However, petitioner argues that part of the purchases were business expenses deductible in the year 1971 because the purchases were items in the nature of supplies. In reviewing the record we have determined that a small amount was for supplies and and have so found. The only items in source of funds with respect to which the parties are not in agreement are depreciation and the downpayment on the Winnebago motor home. The primary argument with respect to depreciation involves the 1971 Lincoln automobile, the truck and the Winnebago motor home. Respondent argues that only 90 percent of the use of the Lincoln automobile was for business. However, in our view the record shows that any use other than business use of this automobile was de minimis. Petitioner owned two other automobiles on which no depreciation *524 was claimed because they were for the personal use of petitioner and his family. On the basis of this record as set forth in our findings, we have determined depreciation in 1971 on the Lincoln automobile for the 10 months petitioner owned it to be $ 930. Also, we have found that the record supports the $ 490 depreciation on the truck as initially determined by respondent rather than the $ 277 argued for by respondent on brief. Finally, we have determined that the Winnebago motor home was used both for business and pleasure and that its usage was approximately half for each. On this basis we have determined depreciation of $ 85 for the two months petitioner owned the motor home in 1971. The one item that petitioner does contend was paid from funds which he had available before the beginning of the year 1971 not considered in respondent's computation is the downpayment on the Winnebago motor home. Petitioner testified that he had sold a house in a year prior to the year here in issue and had received a certified check in payment of part of the purchase price which he used as part of the downpayment for the Winnebago motor home. Petitioner was unsure whether the certified check *525 was $ 2,000 or $ 2,500. Respondent's only argument with respect to allowing petitioner a source of funds for this certified check is that petitioner's testimony should not be believed. Even though respondent attempted to establish a lack of credibility of petitioner, in our view petitioner was a credible witness and we accept his testimony with respect to facts as distinguished from his suspicions and speculations with respect to the DeAngios which we specifically do not accept. We therefore have concluded that petitioner did pay $ 2,000 of the purchase price for the Winnebago from funds available prior to the beginning of the year which are not otherwise accounted for as a source of funds. Furthermore, viewing this record as a whole, any such sum as $ 2,800 paid by petitioner would probably have been by check since most of petitioner's transactions as shown by the record have been by check. If he had not had an item such as a certified check with which to make the payment, respondent, from available copies of petitioner's checks and his bank account statements, would undoubtedly have located the $ 2,800 check in payment of the Winnebago. That no such check apparently was drawn *526 further supports petitioner's position that a substantial portion of the downpayment on the Winnebago was from some source not allowed in respondent's computation. Petitioner argues that respondent did not allow deductions for certain of his business expenses. In our view the record clearly establishes this fact. Petitioner paid some amounts for news services for his radio station in 1971 which he improperly dedcted in 1972. Petitioner argued that respondent disallowed those deductions to him in 1972, but did not allow them in 1971. He makes the same argument with respect to certain other business expense deductions.With respect to payment for news services, clearly petitioner was entitled to the deduction in 1971. However, as respondent points out, on the basis of his computation of source and application of funds, allowance of these deductions would not change the amount of petitioner's understatement of adjusted gross income. If these expenses were allowed, the loss as reported by petitioner on his return of $ 6,761.45 would be increased by the amount of the allowance for these expenses and as a result would cause a comparable decrease in the source of funds. Since the computation *527 here subtracts from application of funds the source of funds, the result would be no change in the understatement of gross income. For this reason we have no attempted to analyze in detail all items which petitioner claims should have been allowed as business expenses in 1971 which were not claimed on his tax return. The result of our computation of source and application of funds for 1971 is an understatement of gross income by petitioner of $ 14,240.47. Therefore, petitioner's adjusted gross income for 1971 is $ 7,479.02. From this adjusted gross income petitioner is entitled to itemized deductions of $ 3,484.36 and to a deduction for three personal exemptions totaling $ 2,025. Decision will be entered under Rule 155.
Footnotes
1. Mrs. Briesacher died in 1973 and the statutory notice of deficiency was issued in 1975. No administrator was named for the estate of Mrs. Briesacher. Mrs. Briesacher was originally named in the petition, but this Court dismissed for lack of jurisdiction this case insofar as it related to Mrs. Briesacher on respondent's motion to which Mr. Briesacher did not object.↩
2. The parties stipulated in this regard as follows: Paragraph 3 of Exhibit 3-C (the Circle Lounge Tavern lease) required petitioner to pay to the lessor Pulaski County Land Development Corporation, upon the signing of that lease, the amount of $ 2,000.00 as advance payment for the first three months and last month of rent. * * * Paragraph 3 of the lease provides: The Lessee shall pay unto the Lessor as rent therefor during the terms of this lease, the sum of Five Hundred Dollars (500.00) per month as rent for said building and the Lessee will pay to the Lessor $ 2,000.00 upon the signing of this lease agreement for advance payment of the first and last months and January 1972 rent of this lease to be applied as the first and last month's rent in advance. The rent paying date shall be the first day of each month, during the term of this lease. Because of the ambiguousness of this provision, we have accepted the stipulated interpretation of the parties.↩
3. 408.170. Contracts paid in full before due date--recomputation of interest 1. If a note or loan contract providing for an amount of interest, added to the principal of the loan is prepaid in full (by cash, renewal, or refinancing) one month or more before the final installment date, the lender shall either: (1) Recompute the amount of interest earned to the date of prepayment in full on the basis of the rate of interest originally contracted for computed on the actual unpaid principal balances for the time actually outstanding; or (2) Give a refund of a portion of the amount of interest originally contracted for which shall be computed as follows: the amount of the refund shall be as great a proportion of such amount of interest as the sum of the full monthly balances of the contract scheduled to follow the installment date after the date of prepayment in full bears to the sum of all the monthly balances of the contract, both sums to be determined according to the payment schedule provided by the contract; provided, however, that if prepayment in full occurs during the first installment period, interest shall be recomputed and charged only for the actual number of days elapsed. When the period before the first installment is more or less than one month, the portion of the interest earned for such period shall be determined by counting each day in such period as one-thirtieth of a month and one-three hundred and sixtieth of a year. 2. No refund shall be required for any partial prepayment. 3. The word "refund" as used herein shall mean a credit or deduction from the amount of interest originally contracyed for. ↩
4. See Wall v. Commissioner, T.C. Memo. 1978-369; Rev. Rul. 72-100, 1972-1 C.B. 122↩.